Receipt number 9998-5077555

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CREATIVE MANAGEMENT SERVICES, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. __18-1864 C__ |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff, Creative Management Services, LLC, dba MC² (but commonly referred to in correspondence and contract documents as "MC-2"), pursuant to 41 U.S.C. §§7104(b)(1) & (3), states as follows for its complaint for a declaratory judgment against defendant, the United States of America, as represented by the General Services Administration ("GSA").

### The Parties

1. MC-2 is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 3 Alpine Court, Chestnut Ridge, NY 10977.

2. GSA is an executive agency of the United States federal Government (the "Government") tasked with, among other things, procuring contracted services for other executive agencies of the federal Government.

### Jurisdiction

3. GSA entered into a Federal Supply Schedule contract with MC-2, Contract No. GS-23F-0302K, and issued annual task orders under that contract for annual conferences for a consortium of federal agencies, including the Department of Energy, designated as the GovEnergy Conference and Trade Show.

1

4. Pursuant to the Contract Disputes Act, 41 U.S.C. §7101 *et seq*, this Court has jurisdiction over this dispute arising under a contract for procurement of services by GSA from MC-2.

5. This action is timely in that it is being brought within one year of GSA's final decision on the MC-2 portion of the dispute in question.

## Overview of the GSA and MC-2 Claims

6. GSA has demanded from MC-2 payment of "approximately" $1,288,429.05 of claimed "excess funds" held by MC-2 from 2009, 2010, and 2011 GovEnergy conferences put on by MC-2 in those years. MC-2 requests a declaratory judgment on the following issues related to that GSA claim: (1) that the amount GSA claims is not owed because MC-2 was operating under a no-cost contract in which the Government paid nothing to MC-2 for the 2009, 2010, and 2011 conferences and MC-2 was entitled to keep any excess of revenue over expenses; (2) that the November 10, 2015, letter from GSA to MC-2 demanding payment of an unspecified amount of "excess funds" was not a final decision with respect to the amount claimed by GSA to be owed to it; and (3) that any claim set forth in a GSA letter of January 31, 2018, for the claimed "excess funds" is beyond the applicable six-year statute of limitations.

7. GSA cancelled the 2012 GovEnergy conference before it began, and MC-2 submitted a termination-for-convenience proposal for its costs incurred to the point of cancellation. GSA accepted substantially all of the amount MC-2 sought in its termination-for-convenience proposal in a final decision on that subject in its letter of November 10, 2015. **Exhibit 1.** In the same letter, GSA asserted that MC-2 owed the Government an unspecified amount resulting from "excess funds" from previous conferences held by MC-2, which unspecified amount was to be offset against the amount allowed for the MC-2 termination-for-

convenience claim. GSA's November 2015 letter was a final decision as to the MC-2 termination-for-convenience claim. MC-2 asks this Court for a declaratory judgment that the amount of that termination-for-convenience claim is due and owing to MC-2 without offset for any Government claim.[1]

## MC-2's No-Cost Contract

8. MC-2 was operating under a Federal Supply Schedule contract with GSA, Contract No. GS-23F-0302K, for the period June 1, 2005, through May 31, 2010. GSA placed separate task orders with MC-2 for services in connection with Conference and Trade Show events, including the GovEnergy Conference and Trade Show. Each of those task orders has been a separate, stand-alone contract.

9. On June 25, 2009, in the course of discussions relating to a new GovEnergy task order, GSA's Contract Specialist, Luanne Wing, sent an email to Jan Conner of MC-2 instructing that the following provision be added to the pricing provisions of MC-2's Federal Supply Schedule contract (GS-23F-0302K):

> The contractor may choose to provide for all services as required by the task order at no cost to the Government. The contractor is entitled to all of the registration, exhibition, sponsorship and/or other fees collected as payment for performance under the task order if there is no cost to the Government. In this case the Contractor is liable for all costs related to the performance of the task/order as defined in the task order and the Government's liability for payment of services under this task order is "zero."

10. The no-cost provision became part of the contract for the August 2009 Conference and Trade Show. MC-2 included the following language in its cost proposal in

---

[1] MC-2 refunded registration fees, sponsorship payments, and exhibitor payments collected for the cancelled 2012 conference up to the date of the cancellation; and there was no surplus from that conference. That contract was not fully performed because of the cancellation; and, therefore, the appropriate method of compensation was a termination-for-convenience proposal submitted pursuant to the FAR, not retention of surplus funds in the account.

Response to GSA's RFP for Integrated Marketing and Logistical Support Order GSA-00-09-AA-0203:

> This concludes MC-2's cost proposal. This cost summary can be completely paid from funds generated from booth, registration, and sponsorship sales. This is a no cost proposal to GSA.

11. In addition, prior to any award of the Order contemplated in the 2009 MC-2 proposal, GSA's contracting officer, Emil Loczko, called Dennis Church of MC-2 to confirm that, if MC-2 were awarded the task order, the order would be a no-cost contract. Dennis Church confirmed that the contract would be at no cost to GSA.

12. Pursuant to MC-2's Proposal, GSA awarded MC-2 Order Number GSA-00-09-AA-0203 dated 7-23-2009. The Order 0203 was issued for a base year period of performance from 08/13/2009 through 08/31/2010 with four one year options. The Contract expressly stated: "Costs for these services can be completely generated from booth, registration and sponsorship sales." Section 20, Schedule, Supplies and Services, (b).

13. After the award, Emil Loczko, the contracting officer for Contract 0203, telephoned Dennis Church to congratulate him on the award of the contract and told him that the no-cost element was a great deal for the Government.

14. MC-2 also included in its proposal for the 2009 conference an extension of the contract on these no-cost terms for an additional five years (one year with four one-year options). By issuing orders for the 2010 through 2012 conferences under Logistical Support Order GSA-00-09-AA-0203, GSA agreed to those no-cost terms for each subsequent conference, including the cancelled 2012 conference.

15. In August 2009, MC-2 filed an updated Authorized Federal Supply Schedule Price List for the GS-23F-0302K contract and included the following provision:

MC-2 can offer NO COST CONTRACTING services to the Government under SIN 541-4C and 541-5.  If the task proposed by the Government has the potential to generate revenue to cover all expenses, MC-2 will assume liability for all costs related to performance of the task order as defined in the task order and the Government's liability for payment of services under the task order will be "zero."  MC-2 will be entitled to all of the registration, exhibition, sponsorship and/or other fees collected as payment for performance under the task order.

16. Each year the accounting for that year's conference was begun with zero revenue. There was never any line item in the accounting for any amount carried forward from a prior conference. There was no "reserve" existing at the completion and final accounting of each separate contract. No amounts where revenues exceeded expenses at the completion of each contract were carried over or applied to any subsequent contract.

17. In the parties' course of dealing under this no-cost format, GSA did not claim that it was entitled to the excess of any revenue that exceeded expenses. In exercising options for subsequent contracts, GSA never suggested that any excess of revenues over expenses in a prior contract be applied to a subsequent contract. After receipt each year of the final accounting for the current year's conference, GSA did not suggest or request that any excess of revenue over expenses be paid to GSA.

18. GSA did not assert that it owned the contested funds until after the termination of the 2012 conference, in an email from Eugene Lee to Dennis Church on July 18, 2012, in which Mr. Lee requested "return" of all amounts in a so-called "Reserve Fund."

19. Section 4.0 of the July 23, 2009, task order (GSA-00-09-AA-00203) provides that "Contractor's compensation is limited to the following." The specific items to which compensation is limited include:

- "Management Fee:" (expressed as a percentage of registration revenue).
- "Registration Fee per attendee."

- "Tradeshow hall Management and Trade Show Production Services."

- "Additional Labor Categories:" (for services not included in the Statement of Work).

- "Travel costs, for travel authorized by GSA COTR."

All of the funds GSA is claiming are items included in this list of items of **Contractor compensation**.

20. In discussion of its claim, GSA has cited other provisions of Section 4.0 out of context as support for its argument that these funds must be held in trust for future GovEnergy conferences and eventually must be paid to the Government. In context, this cited language clearly refers only to a trust for the conference covered by that particular, current-year task order, to insure sufficient funds for its successful completion.

> **For this conference, during the course of this contract**, the Contractor shall collect monies from attendee and exhibitor registration fees. The Contractor shall collect and account for such monies and hold them in trust for GovEnergy. The Contractor shall maintain and provide to GovEnergy an accounting of all incoming monies in order to assure GovEnergy that all collected revenue has been accounted for. (Emphasis added.)

21. The next paragraph provides that: "The monies collected shall comprise the "Reserve" **for the conference event**." (Emphasis added.) This paragraph continues to provide: "**With GSA COTR's *written authorization* upon review of a written monthly invoice, the COTR *may* direct the Contractor to pay itself for services provided, as well as the other monthly expenses, from the respective conference event "Reserve".**" (Emphasis in original.) Thus, with the COTR's approval, the Contractor may be allowed to pay itself from the Reserve **before the conference under the current task order is completed**.

6

22.     Neither GSA nor any other Government agency paid MC-2 anything for its services under its 2009, 2010 and 2011 contracts.  There simply are no Government funds to "return" to GSA.

### The Prior Contract

23.     Before the change to a no-cost contract in 2009, MC-2 operated under a very different type of contract.  There were funds provided from previous contracts to cover costs before registration and exhibitor fees were collected.  Under that type of contract, funds remaining at the end of a conference **were** to be kept as a reserve for future conferences.  For example, at the request of the contracting office, MC-2 sent Energetics $177,646.97 in the 2007 "reserve fund/surplus" on May 8, 2008.  Because these transfers were pursuant to a different contract type, they are only relevant to show the differences in the performance of the parties under the prior contract.

24.     In its November 10, 2015, letter, GSA cited provisions of the GovEnergy Charter entered into by various federal agencies as supporting its interpretation of the MC-2 contracts.  *E.g.*, **Exhibit 1** at 5.  These provisions also are irrelevant.  MC-2 was not a party to this Charter, and the Charter was not incorporated in the GSA FSS schedule contract with MC-2 or any of the task orders issued under that contract in the years 2009 through 2012.  In addition, at the time the agencies established this Charter, they did not contemplate a no-cost contract like the one entered into by GSA and MC-2 in 2009.  They were thinking in terms of the contract format GSA and MC-2 used before the 2009 change to a no-cost format, in which funds from prior contracts were to be used to pay a portion of the Contractor's expenses at the beginning of the following year.

25.     GSA also has cited an undated excerpt from the pre-bid Q and A for the 2009 conference regarding carry-over of excess funds from one year to the next.  The response to this

question is irrelevant because it was prepared before the contract was changed to the no-cost format.

### The November 2015 GSA Letter

26.     GSA appears to be relying on an allegation that its November 10, 2015, letter to counsel for MC-2 was a final decision. That letter was not a final decision on the Government's offset claim because it did not state a "sum certain." FAR 2.101 (definition of Claim). Instead, it said the Government was owed "approximately $1.2 million" and "nearly $1.3 million." **Exhibit 1** at 2 & 10.

27.     The November 2015 letter mentioned a precise amount ($1,288,429.05); but it did not state that this amount was the amount of the Government's claim. It merely mentioned that this was the total amount of compensation MC-2 said it had collected as of the end of the 2011 Conference: "MC-2, prior to the cancellation of the Conference, had sent the Contracting Officer an email dated July 11, 2012, stating that the surplus at the end of the 2011 GovEnergy Conference was nearly $1.3 million - *i.e.*, $1,288,429.05." **Exhibit 1** at 2.

28.     When the November 2015 letter presented the amount allegedly due as an offset, it was deliberately vague, stating only that GSA "believes" the amounts of both the MC-2 termination-for-convenience proposal and the GSA final decision on that proposal are "significantly less" than the amount of the Government's claim. **Exhibit 1** at 9.

29.     The implicit excuse for not providing a sum certain, repeated throughout the GSA's November 2015 letter, is an allegation MC-2 had not provided an accounting for the excess funds it was holding. For example, the letter states:

> The Contracting Officer's response [in a June 22, 2015, "letter" responding to a February 2015 email] was to state that it "was impossible for GSA to accept MC2's recent statements that there are no remaining reserve funds, and in the alternative that MC2 is entitle [sic] to such monies if they exist, without receiving the required final accounting

for 2012 and an explanation of the $1,288,429.05 that MC2 stated existed following the 2011 conference." **Exhibit 1** at 5.

30. In fact, MC-2 had provided an accounting at the end of each conference in the years 2009 through 2011.

31. This annual submission of an accounting was in accordance with the requirement of Section 4.0 relating to an accounting **for the current year's contract only**, as is explained above. Each final accounting reflected any surplus amount of revenue over expenses: $501,951.45 for the 2009 conference, $366,696.40 for the 2010 conference, and $419,781.20 for the 2011 conference. Thus, a final accounting for each of the years 2009 through 2011 was sent to GSA by the end of September of those years.

32. The same accounting figures were provided again in 2012 after the cancellation of the 2012 conference in an email from Dennis Church to Eugene Lee dated July 10, 2012.

33. In addition, copies of the final accountings for the 2010 and 2011 contracts were sent to Emil Loczko, the contracting officer, in Dennis Church's email to him on July 10, 2012.

34. GSA's argument in the November 2015 letter for not considering one of these emails to be an accounting was that it was not on MC-2 letterhead and was not signed. **Exhibit 1** at 5. GSA made no such objection upon receipt of these emails in July 2012.

### The January 2018 GSA Letter

35. GSA did not provide a sum certain for its claim until, at the earliest, its letter of January 31, 2018, to Dennis Church at MC-2, in which it argued, incorrectly, that the contracting officer, in the November 10, 2015, letter, had "determined that MC-2 failed to account for, and improperly retained, $1,288,429.05 that was held in trust for the Government." **Exhibit 2** at 1.

36. MC-2 has satisfied any condition precedent to the bringing of this action.

**COUNT I**

37.     MC-2 repeats and re-alleges the foregoing paragraphs 1 through 36 above as paragraph 37 of this Count I of its complaint.

38.     The unambiguous terms of Section 4.0 of these no-cost contracts clearly belie GSA's contract-interpretation argument that the items of Contractor compensation were to be kept in reserve for future conferences.

39.     For the 2009 GovEnergy conference and each succeeding conference through the terminated 2012 conference, the format of the contracts was at no-cost to the Government. The Government paid nothing to MC-2 for producing these conferences, which were funded by revenue generated during the conferences. Therefore, MC-2 is entitled to keep any excess of revenue over expenses as part of its profit and has no obligation to refund any of that excess to the Government. The plain and unambiguous language of the parties' contracts for these years so provides.

40.     Ownership of funds in a reserve and the obligation to keep a reserve for future conferences are separate issues. Thus, even if the GSA interpretation were correct as to the obligation to keep a reserve for future conferences, and it is not, the provision was no longer necessary once the MC-2 contract had been terminated for convenience. There were no future conferences on which funds in reserve could be used. Indeed, GSA did not even assert that it owned the contested funds until after the termination of the 2012 conference.

41.     Accordingly, as requested by GSA, MC-2 refunded the revenue it had collected from exhibitors and attendees for the terminated 2012 conference and submitted a termination-for-convenience proposal to recoup the expenses it incurred before and as a result of the termination.

42.     The appropriate compensation for the terminated 2012 conference, which was to have been held under the last task order, is the amount GSA authorized in the contracting officer's November 2015 final decision on MC-2's termination proposal.

WHEREFORE, for the reasons stated above, MC-2 prays this Court for a judgment declaring that, under the provisions of the parties' contracts applicable to the subject GovEnergy conventions held in the years 2009 through 2011, MC-2 is entitled to keep any funds representing the excess of revenue over expenses left at the end of each of those conventions and for such other and further relief the Court may deem just and proper under the circumstances.

## COUNT II

43.     MC-2 repeats and re-alleges the foregoing paragraphs 1 through 42 above as paragraph 43 of this Count II of its complaint.

44.     The definition of "Claim" in the definitions of Section 2.101 of the Federal Acquisition Regulations is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money **in a sum certain** ...."   (Emphasis added.)   Thus, the requirement of a sum certain applies to the Government as well as the contractor.

45.     The GSA letter of November 10, 2015, was not a final decision as to the Government's claim for a refund of the excess of revenue over expenses for the 2009 through 2011 GovEnergy conferences because the letter failed to state a sum certain for the Government's claim. Instead, GSA stated that the amount it was seeking is "nearly $1.3 million" and "approximately $1.2 million"  **Exhibit 1** at 2 & 10.  An amount stated as an approximation is not a sum certain.

46. Moreover, GSA mentioned, but did not accept as accurate, the specific amount MC-2 provided in its annual accountings and in its July 2012 cumulative review of the annual figures. The November 2015 GSA letter deliberately avoided stating any precise amount for its claim.

47. Assuming for purposes of this action that the January 31, 2018, GSA letter to Dennis Church is a final decision, this declaratory judgment action is timely filed within one year of that final decision.

WHEREFORE, for the reasons stated above, MC-2 prays this Court for a judgment declaring that GSA's November 10, 2015, letter was not a final decision with respect to amounts claimed by GSA to be due to it and that, therefore, this action was timely filed, and for such other and further relief the Court may deem just and proper under the circumstances.

## COUNT III

48. MC-2 repeats and re-alleges the foregoing paragraphs 1 through 47 above as paragraph 48 of this Count III of its complaint.

49. Section 7103(a)(4) of Title 41 of the U.S. Code provides that, except for a Government claim against a contractor involving fraud: "Each claim by a contractor against the Federal Government relating to a contract and each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." A Government claim accrues when the Government knew or should have known it had a claim.

50. If GSA believed it had a claim for "excess funds," GSA should have known it had such a claim in 2009 when MC-2 did not transfer excess funds to Energetics for that year, as it had done in years before 2009, and should have known it had such a claim in each succeeding year through 2011 for the same reason.

51.     The six-year limitations period on GSA's claim for payment of excess funds from each conference held in 2009 through 2011 had passed by the time GSA sent its January 31, 2018, letter to MC-2.

52.     On information and belief, the Government in fact did know of its claim for refund of the excess of revenues over expenses under the 2009 through 2011 contracts before January 31, 2012. GSA first asserted such a claim in July 2012, when it requested the "return" of money in a so-called "Reserve Fund;" but it is unlikely GSA had just thought of that argument for ownership of these funds. Thus, even by this measure of actual knowledge, the six-year limitations period passed before GSA sent its January 31, 2018, letter to MC-2.

WHEREFORE, for the reasons stated above, MC-2 prays this Court for a judgment declaring that GSA's January 31, 2018, letter purporting to be a final decision with respect to GSA's claim for payment to it was sent more than six years after the Government's claim for funds held by MC-2 accrued and, therefore, that any such claim the Government otherwise might have is barred by the applicable six-year statute of limitations, and for such other and further relief the Court may deem just and proper under the circumstances.

## COUNT IV

53.     MC-2 repeats and re-alleges the foregoing paragraphs 1 through 52 above as paragraph 53 of this Count IV of its complaint.

54.     With respect to MC-2's termination for convenience claim, MC-2 did not appeal and has accepted the contracting officer's final decision on its termination-for-convenience proposal as set forth in GSA's November 10, 2015, letter.

55.     The amount of that final decision, $628,415.37, is now due, without deduction of the amount of the Government's purported claim for excess funds held by MC-2.

WHEREFORE, for the reasons stated above, MC-2 prays this Court for a judgment declaring that GSA's November 10, 2015, letter was a final decision as to the MC-2 termination-for-convenience proposal only and, therefore, that payment of the amount GSA approved in that letter ($628,415.37) is due and owing to MC-2 without any offset for a Government claim, and for such other and further relief the Court may deem just and proper under the circumstances.

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

By /s/ Charles A. Weiss

Charles A. Weiss, MO Bar #20299
cweiss@bclplaw.com
Stephen R. Snodgrass, MO Bar #29017
    (*pro hac vice* to be submitted)
srsnodgrass@bclplaw.com
211 N. Broadway
St. Louis, MO 63102
(314) 259-2000
(314) 259-2020 (fax)

Adam L. Shaw, D.C. Bar #1035046
adam.shaw@bclplaw.com
1155 F Street, NW
Washington, DC 20004-1357
(202) 508 6000
(202) 508 6200 (fax)

*Attorneys for Plaintiff*